1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

7
8

TOMMIE LEE MCDOWELL, JR.,          )          3:12-cv-00249-MMD-WGC
                                   )
         Plaintiff,                )          **REPORT AND RECOMMENDATION**

9
                                   )          **OF U.S. MAGISTRATE JUDGE**
         vs.                       )

10
                                   )
RICHARD RIMINGTON, et. al.         )

11
                                   )
                                   )

12
         Defendants.               )
_____   )

13
14

        This Report and Recommendation is made to the Honorable Miranda M. Du, United

15
States District Judge. The action was referred to the undersigned Magistrate Judge pursuant

16
to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is

17
Plaintiff's partial motion for summary judgment. (Doc. # 23.)[1] Defendants opposed the motion

18
and filed a cross motion for summary judgment. (Doc. # 41.) Plaintiff filed a reply in support

19
of his motion (Doc. # 45) as well as an opposition to Defendants' motion (Doc. # 44).

20
Defendants then filed a reply in support of their motion. (Doc. # 46.)

21
        After a thorough review, the court recommends that Plaintiff's partial motion for

22
summary judgment (Doc. # 23) be denied, and that Defendants' cross-motion for summary

23
judgment (Doc. # 41) be granted in part and denied in part.

24

### I. BACKGROUND

25
**A. Plaintiff's claims**

26
        Plaintiff, Tommie Lee McDowell, Jr., a *pro se* litigant in custody of the Nevada

27
28
_____

        [1] Refers to court's docket number. Unless otherwise noted, all page number references are to the page numbers from the court's docketed version, and not to the parties' original page numbers.

Department of Corrections (NDOC), brings this action pursuant to 42 U.S.C. § 1983. (Pl.'s Compl., Doc. #4, at 1.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison. (*Id*.) Defendants are Richard Rimington, John Oxborrow and Ronald Bryant. (*Id*. at 2.)

On screening the court determined that Plaintiff states colorable First Amendment retaliation claims Counts I and IV, a conspiracy to retaliate claim in Count II, as well as a due process claim under the Fourteenth Amendment in Count III. (Screening Order, Doc. # 3.)

In his first claim for retaliation and conspiracy, set forth in Counts I and II, Plaintiff alleges the following: In February 2011, he filed three grievances against Correctional Officer Rimington. (Doc. # 4 at 4.) When he handed the third grievance to Rimington, he told Plaintiff, "you'll be sorry if I have to hand this emergency grievance over to my senior [defendant Senior Correctional Officer Oxborrow]."(*Id*.) About a month later, Plaintiff received a notice of charges for making threats which was written by Rimington. (*Id*.) Plaintiff contends the notice of charges was completely unfounded, and written in retaliation for Plaintiff filing grievances against Rimington. (*Id*.) The report contained a statement by Oxborrow that he had heard the alleged threats from his location in the control tower. (*Id*. at 5, 6.) Plaintiff asserts that given the distance between the control room and inmate cells, this was highly implausible. (*Id*.) Plaintiff alleges that Oxborrow conspired with Rimington to retaliate against Plaintiff by making this false statement in the disciplinary report. (*Id*.)

Plaintiff's second retaliation claim is set forth in Count IV. (Doc. # 4 at 11.) Plaintiff alleges that on November 16, 2011, he filed an emergency grievance against Rimington for slamming his kosher lunch against the flap of his cell door with such force that its contents exploded. (*Id*.) He states that he promptly notified Oxborrow of the incident and that he would be filing an emergency grievance. (*Id*.) On December 31, 2011, he received a "write-up" authored by Oxborrow, stating that Plaintiff's claims against Rimington were false, and charging him with giving false information. (*Id*.) Plaintiff asserts that the charges were ultimately dismissed, but that the report and notice of charges were filed against him in

retaliation for filing the grievance against Rimington. (*Id*.)

Count III contains Plaintiff's due process claim. There, Plaintiff alleges the following: He received the disciplinary report for making threats in February 2011 (which arose from the incident described above in Counts I and II) on April 8, 2011, and then about a day later, Lieutenant Correctional Officer Bryant came to his cell and asked him if he had any witnesses, to which Plaintiff replied that he did, and wrote the names down. (Doc. # 4 at 7.) Plaintiff's disciplinary hearing was held on April 12, 2011, and Bryant served as the hearing officer. (*Id*.) Bryant refused Plaintiff's request to present witnesses and witness statements at the hearing, which Plaintiff asserts would have refuted the statements of Rimington and Oxborrow. (*Id*.) Plaintiff was ultimately found guilty of the charge and sanctioned to 180 days in disciplinary segregation. (*Id*.)

Plaintiff claims his stay in disciplinary segregation constituted an atypical and significant hardship because it strained ties with his family because he had to tell them about the charges against him (that he threatened to rape and kill defendant Rimington's family members). (*Id*. at 8.) In addition, he asserts that his familial ties were strained because telecommunications and visits were limited. (*Id*.) He contends that in general population he could use the telephone on a daily basis, but could only do so once a month in disciplinary segregation. (*Id*.) In addition, in disciplinary segregation, visits are limited to immediate family members and are restricted to no-contact. (*Id*.) He asserts that his long-time friend was prohibited from visiting during the time he was housed in disciplinary segregation. (*Id*.) He further alleges that he was forced to live in close proximity to "recalcitrant and violent prisoners with severe psychological issues, who banged on their cell doors, toilets, sinks, and bunks all day and night resulting in sleep deprivation, gross noise pollution, and heart palpitations" which he claims he would not have experienced in general population. (*Id*. at 8-9.) He claims that he had to avail himself of the prison's psychiatric department to deal with these conditions. (*Id*. at 9.)Plaintiff further avers that in disciplinary segregation he was forced to shower on his knees, in shackles, in puddles of stagnant and contaminated water, which he would not have had to do in general

population. (*Id.*) He also states that he suffered from migraine headaches because he did not have access to coffee in disciplinary segregation. (*Id.*) Nor did he have access to television or music. (*Id.*)

**B. Plaintiff's partial motion for summary judgment as to Counts III & IV (Doc. # 23)**

Plaintiff moves for partial summary judgment on his due process claim against defendant Bryant in Count III and his retaliation claim in Count IV. (Doc. # 23.)

With respect to Count III, Plaintiff asserts that it is undisputed that his request to present witnesses as well as their written statements at his disciplinary hearing was refused by Bryant, in violation of his due process rights. (*Id.*)

As to Count IV, Plaintiff contends that it is undisputed that he notified Oxborrow that he completed an emergency grievance reporting Rimington's alleged conduct in connection with the Kosher meal incident on November 16, 2011 at 3:42 p.m., and on the same date, at 3:50 p.m., Oxborrow filed a disciplinary report against Plaintiff asserting that Plaintiff's charges against Rimington were false. (Doc. # 23 at 15-16.) On December 31, 2011, Plaintiff claims he was officially notified of the charges against him. (*Id.*) He asserts that Oxborrow's filing of the disciplinary report was in direct response to Plaintiff's grievance activities against Rimington. (*Id.*) While the charge of making false statements was ultimately dismissed, Plaintiff asserts that he was unsuccessful in defending against the charge of delaying, hindering or interfering with staff, and this created a chilling effect with respect to his grievance writing activities. (*Id.* at 18.)

**C. Defendants' opposition and cross-motion for summary judgment (Doc. # 41)**

Defendants filed an opposition to Plaintiff's partial motion for summary judgment and a cross-motion for summary judgment where they argue they are entitled to summary judgment on all of Plaintiff's claims.

### 1. Counts I, II, and IV-retaliation & conspiracy

#### a. Counts I & II-Defendants' version of events

As to the retaliation and conspiracy claims in Counts I and II, Defendants maintain that

4

the notice of charges was not brought against Plaintiff in retaliation for filing grievances; instead, they assert that Plaintiff made repeated threats to Rimington on February 28, 2011, that he would inflict harm upon Rimington and his family. (Doc. # 41 at 2-3; Doc. # 41-1 at 6-8, Ex. A (Rimington Decl.) ¶¶ 4-6; Doc. # 41-1 at 12-14, Ex. C (Oxborrow Decl.) ¶ 8.) Rimington asserts that after enduring Plaintiff's egregious threats for a good portion of his day, he submitted an incident report regarding Plaintiff's conduct. (Doc. # 41 at 2-3; Rimington Decl. ¶ 8.) Oxborrow, who was working in the control room across the tier, could hear an inmate yelling on the tier, and Rimington told him it was Plaintiff. (Doc. # 41 at 2-3; Rimington Decl. ¶ 7; Oxborrow Decl. ¶ 4.) Plaintiff was then given a notice of charges for making threats and interfering with and hindering staff, to which Plaintiff plead not guilty. (Doc. # 41 at 2-3; Rimington Decl. ¶¶ 8-9.)

### b. Count IV-Defendants' version of events

With respect to Count IV, Defendants acknowledge that Plaintiff claimed Rimington slammed his Kosher meal into the food slot, and that he filed an emergency grievance stating that this was intentional. (Doc. # 41 at 3.) Rimington disputes Plaintiff's allegations, maintaining that Plaintiff caused the meal to hit the food slot, and wrote a report to that effect. (*Id.*, Rimington Decl. ¶¶ 12-13.) Oxborrow asserts that he witnessed the incident, which corroborates defendant Rimington's version of events, and advised Bryant that Plaintiff's claim against Rimington was false. (Doc. # 41. at 3-4; Oxborrow Decl. ¶¶ 10-11.) Plaintiff was subsequently issued a notice of charges for making false statements and for hindering and interfering with staff. (Doc. # 41 at 4; Rimington Decl. ¶ 14; Oxborrow Decl. ¶ 12.) A disciplinary hearing was held, a negotiated plea was entered and Plaintiff was given a verbal reprimand. (Doc. # 41 at 4; Doc. # 41-1 at 30-31.) Rimington and Oxborrow maintain that they did not retaliate against Plaintiff for filing grievances; rather, their action was in response to Plaintiff giving false information regarding the Kosher meal incident. (Rimington Decl. ¶¶ 15-16; Oxborrow Decl. ¶¶ 12-13.)

### c. Argument

With these facts in mind, Defendants argue that Plaintiff cannot demonstrate a connection between his protected conduct, *i.e.* filing grievances against Rimington, and the issuance of the notice of charges, with respect to either retaliation claim. (Doc. # 41 at 6-7.) Instead, they argue that the first notice of charges was issued against Plaintiff because he threatened Rimington's family. (*Id.* at 6.) Likewise, they assert that the second notice of charges was issued because Plaintiff made false statements regarding Rimington slamming the Kosher meal into the food slot. (*Id.* at 7.)

Defendants also contend that issuance of the two charges did not chill the exercise of Plaintiff's speech because he filed grievances while the charges were pending and continued filing grievances after they were resolved. (*Id.* at 7; Ex. H at Doc. # 41-2 and Doc. # 41-3.)

Finally, Defendants maintain that the issuance of the charges in both instances was supported by a legitimate correctional goal, namely, discouraging inmates from being verbally abusive, threatening staff, giving false information and hindering and delaying staff. (*Id.* at 7-8.)

### 2. Count III-due process

Bryant asserts that he was appointed the hearing officer for Plaintiff's offense in April 2011, and spoke with both Plaintiff and Oxborrow in preparation for the hearing which was conducted on April 12, 2011. (Doc. # 41 at 3; Doc. # 41-1 at 23-24, Ex. E (Bryant Decl.) ¶¶ 4-5.) Plaintiff gave his statement. (Doc. # 41 at 3.) Bryant asked Plaintiff if he had witnesses, and Plaintiff responded that he had witnesses and written witness statements. (Doc. # 41 at 3; Bryant Decl. ¶ 6.) Bryant conceded that any witnesses called would concur with any statement made by Plaintiff, and concluded that their testimony and the presentation of their statements would be redundant and unnecessary. (Bryant Decl. ¶ 6.) Even taking the potential witness testimony as true, after considering Plaintiff's testimony, Rimington's written report and the verbal report of Oxborrow, he found Plaintiff guilty of the charge of making threats. (Doc. # 41 at 3; Bryant Decl. ¶ 7.) Plaintiff was sanctioned to 180 days in disciplinary segregation. (Bryant

Decl. ¶ 8.)

Bryant argues that he was within his discretion to limit Plaintiff's ability to call witnesses because the evidence Plaintiff sought to introduce would be redundant and unnecessary as the witnesses were merely offered to corroborate Plaintiff's version of events. (Doc. # 41 at 11.)

In addition, Bryant argues that the disciplinary hearing satisfied the "some evidence" standard; therefore, he did not violate Plaintiff's due process rights in finding him guilty. (Doc. # 41 at 11-12.)

**3. Official capacity damages claims**

Finally, Defendants assert that they cannot be sued in their official capacities for damages. (Doc. # 41 at 13.)

**D. Plaintiff's response to Defendants' cross-motion re: Counts I & II (Doc. # 44)**

Plaintiff argues that Defendants are not entitled to summary judgment because material factual issues exist as to his retaliation and conspiracy claims against Rimington and Oxborrow in Counts I and II. (Doc. # 44.)

Plaintiff once again recounts his version of the facts giving rise to the February 28, 2011 retaliation and conspiracy claims and submits a declaration as well as various exhibits in support of his opposition. (Doc. # 44; McDowell Decl. at 63-6.)

Plaintiff then includes a reference to the statement in Bryant's disciplinary hearing summary which states that he relied on the verbal report of Oxborrow, who indicated he heard the threats made by Plaintiff against Rimington. (Doc. # 44 at 6-9.) Plaintiff asserts that Oxborrow's responses to discovery as well as his declaration in support of Defendants' cross-motion for summary judgment contain an admission that while he heard yelling on the tier, he did not hear the substance of the yelling. (*Id*.) Plaintiff similarly claims that the statement in the disciplinary hearing summary which indicates that Oxborrow encouraged Rimington to file a notice of charges against Plaintiff is not true, because Oxborrow admitted this was not the

case in his discovery responses. (*Id.* at 9-11.) [2]

Finally, Plaintiff references the retaliation claim set forth in Count IV in his declaration. Plaintiff provides further detail regarding the timing of the events giving rise to the claim. He asserts that Oxborrow wrote a disciplinary wrote/notice of charges against Plaintiff for falsifying information regarding the Kosher meal hours after Plaintiff filed his grievance on the issue, although Plaintiff was not formally notified of the charges until approximately a month and a half later. (McDowell Decl., Doc. # 44 at 64 ¶ 10.) Plaintiff also disputes Defendants' assertion that there was a negotiated plea with respect to this charge, claiming that this charge cannot be negotiated under NDOC's Administrative Regulation 707. (*Id.* at 64-65 ¶ 10.) [3] Instead, Plaintiff maintains that the hearing officer believed his version of events over Defendants', and he prevailed on the charge. (*Id.*)

///

///

///

---

[2] It is not entirely clear what Plaintiff's intent is in raising this argument. To the extent it is raised to support his conspiracy claim, it will be discussed in connection with the court's analysis of that claim below. However, to the extent the argument is raised with respect to the due process claim against Bryant, in an attempt to show he was falsely accused of making threats, it is not persuasive. Courts have held that prisoners do not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *Freeman v. Rideout*, 808 F.2d 949, 951-52 (2d. Cir. 1986), *cert. denied*, 485 U.S. 982 (1988) (allegation that false evidence was planted by a prison guard does not state a constitutional claim where procedural process protections are provided); *see also York v. Hernandez*, 2011 WL2650243, at * n. 3 (N.D. Cal. 2011) (where plaintiff alleged violation of due process rights by filing false charges against him, court stated, "without more, a prisoner has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."); *Tafilele v. Harrington*, 2011 WL2462750, at *7 (E.D. Cal. 2011). Rather, the Fourteenth Amendment provides that a prisoner has a right not to be deprived of a protected liberty interest without due process of law. *Sprouse*, 870 F.2d at 452. Thus, as long as a prisoner receives proper procedural due process, a claim based on the falsity of disciplinary charges, standing alone, does not state a constitutional claim. *Id.*; *see also Freeman*, 808 F.2d at 951; *Hanrahan v. Lane*, 747 F.2d 1137, 1140-41 (7th Cir. 1984).

[3] The court notes that Plaintiff's position is consistent with the version of AR 707 accessible via NDOC's website. *See* http://www.doc.nv.gov/sites/doc/files/pdf/AR707.pdf at page 4 of 9, last visited June 18, 2013 (G20 charge of "[p]reparing, soliciting. or giving false or misleading information to or about a staff member and representing the statement as fact" "cannot be plea-bargained or sanction bargained").

1    **E. Plaintiff's reply brief filed in response to Defendants' opposition to his partial motion for summary judgment re: Counts III & IV (Doc. # 45)**

2        **1. Count III**

3        In his reply brief, Plaintiff once again argues that he is entitled to summary judgment

4    on his due process claim against Bryant in Count III because Bryant refused Plaintiff's request

5    to call witnesses or present their written statements at his disciplinary hearing. (Doc. # 45 at

6    1-4.) Plaintiff claims that it was Bryant's burden to establish that his refusal to permit Plaintiff's

7    witnesses or their statements was not arbitrary and capricious. (*Id.* at 4.)

8        Plaintiff further argues that his constitutional rights were violated because Bryant was

9    not an impartial hearing officer as he was both investigator and hearing officer for this offense.

10   (*Id.* at 6-9.)[4]

11       Next, Plaintiff asserts an argument that his disciplinary conviction was not supported

12   by "some evidence" because Bryant relied on Oxborrow's verbal report that he heard the threats

13   made by Plaintiff, and that he encouraged Rimington to file the notice of charges, and

14   Oxborrow has since admitted that both of these statements were not true. (Doc. # 45 at 10.)[5]

15       Finally, Plaintiff includes additional facts to support his argument that his stay in

16   disciplinary segregation rises to the level of an atypical and significant hardship. (Doc. # 45 at

17   13.) He now asserts that for the first three weeks he was in disciplinary segregation he had only

18   his undergarments, tennis shoes and a roll of toilet paper. (*Id.*) He did not have a pillow,

19   mattress or any type of bedding. (*Id.*) Nor was he in possession of hygiene products or utensils

20   for eating or drinking. (*Id.*)

21       **2. Count IV**

22       Plaintiff once again recounts his version of the events giving rise to Count IV. (Doc. #

23

24       [4]The fact that this was not explicitly alleged, and not allowed to proceed as a claim in the court's screening

25   order, is discussed in the court's analysis of this claim below.

26       [5]*See* n. 3, *infra*, citing authority that prisoners do not have a constitutionally guaranteed immunity from
     being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, and

27   discussing the fact that Bryant still relied on Rimington's statement which constitutes "some evidence" and which
     is discussed further in the court's analysis of this claim.

28                                                              9

45 at 14.) Plaintiff then argues that Oxborrow has not given a legitimate justification for filing the disciplinary report against Plaintiff. (*Id*.) Plaintiff further asserts that evidence of the retaliatory nature of Oxborrow's conduct includes the fact that the false information charge was dismissed because the hearing officer believed Plaintiff's version of events over Oxborrow's. (*Id*. at 18.) He points out that this is contrary to Defendants' assertion that the charge was handled through a negotiated plea. (*Id*.) Plaintiff claims that the disciplinary report would not have been written had Plaintiff not filed the grievance against Rimington. (*Id*.) This, he concludes, is evidenced in part by the proximity of the filing of his grievance and the writing of the report. (*Id*. at 19.)

Next, Plaintiff addresses the chilling effect the conduct had on his First Amendment rights. (Doc. # 45 at 20.) He asserts that all he did was report what he perceived to be misconduct on the part of Rimington when Rimington slammed his Kosher meal into the food slot, and then he received a disciplinary "write-up", which made him feel that the consequence of complaining about perceived misconduct is that you get "written-up"; therefore, with respect to "some matters, it's just safer not to complain." (*Id*. at 21.)

## F. Defendants' reply in support of their cross-motion (Doc. # 46)

In their reply, Defendants first assert that Plaintiff did not deny in his opposition that he made threats to Rimington and his family, so this fact must be taken as true. (Doc. # 46 at 1.) In addition, they argue that he has not raised a genuine issue of material fact so as to avoid summary judgment. (*Id*. at 1-2.) They contend that Plaintiff merely concludes that the elements of his claims are in his favor with providing supporting evidence. (*Id*.) Defendants further claim that Plaintiff has provided no evidence that his rights were chilled, or to support a conclusion that Defendants did not have a valid penological interest in taking the action they took. (*Id*.) They conclude that Plaintiff has only provided mere speculation that Oxborrow and Rimington conspired to retaliate against him. (*Id*.)

Bryant maintains that he was within his discretion to preclude Plaintiff from calling witnesses, and Plaintiff's guilty determination was supported by "some evidence," *i.e.* the

information contained within Rimington's report. (*Id*. at 3-4.)

## II. SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric*., 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id*. (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went

11

uncontroverted at trial.'In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations

1   omitted).

2   ### III.  DISCUSSION

3   **A. RETALIATION**

4   **1. Elements of retaliation claim**

5   A retaliation claim requires: "(1) An assertion that a state actor took some adverse action

6   against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)

7   chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

8   reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68

9   (9th Cir.  2005) (citations omitted); *see also Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir.

10   2009) (quoting *Rhodes*, 408 F.3d at 567-68). Retaliation claims must be evaluated in light of

11   the deference that must be accorded to prison officials. *See Pratt v. Rowland*, 65 F.3d 802, 807

12   (9th Cir. 1995).

13   **a. adverse action**

14   "[A] retaliation claim may assert an injury no more tangible than a chilling effect on

15   First Amendment rights." *Brodheim*, 584 F.3d at 1269-79 (internal quotation marks and

16   citations omitted). "[A]n allegation that a person of ordinary firmness would have been chilled

17   is sufficient to state a retaliation claim[.]" *Id*. at 1270 (citing *Rhodes*, 408 F.3d at 568, n. 11).

18   "Thus, the mere *threat* of harm can be an adverse action, regardless of whether it is carried out

19   because the threat itself can have a chilling effect." *Id*. (finding a genuine issue of material fact

20   existed as to whether adverse action was taken where prison official warned the inmate to stop

21   complaining).

22   **b. Causation**

23   An inmate must submit evidence, either direct or circumstantial, to establish a link

24   between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt*, 65 F.3d

25   at 806-07. "[A] plaintiff must show that his protected conduct was the 'substantial' or

26   'motivating' factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271 (internal

27   quotation marks omitted, quoting *Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th

28   13

Cir. 1989)). The plaintiff "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent[.]'" *Id.* (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)). Timing of the events surrounding the alleged retaliatory action may constitute circumstantial evidence of retaliatory intent. *See Sorrano's Gasco*, 874 F.2d at 1316.

A plaintiff's mere speculation that there is a causal connection is not enough to raise a genuine issue of material fact. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment") (citation omitted).

### c. Protected conduct

The Ninth Circuit has recognized that prisoners have a fundamental First Amendment right to file prison grievances and pursue civil rights litigation, and "because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes*, 408 F.3d at 567 (citation omitted).

### d. Chilling effect

"[A]n objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568-69).

### e. Legitimate penological interest

"[A] prisoner must show that the challenged action 'did not reasonably advance a legitimate correctional goal.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568).

"[I]n determining whether a proffered legitimate penological interest is reasonably related to a regulation which infringes on a prisoner's constitutional right" the court must consider the "four factors set forth in *Turner v. Safley*, 482 U.S. 78," which are:

a 'valid rational connection' between the prison regulation and the legitimate

14

1

2

3

4

5

[and neutral] governmental interest put forward to justify it.' If the connection between the regulation and the asserted goal is 'arbitrary and irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor. In addition, courts should consider three other factors: the existence of 'alternative means of exercising the right' available to inmates; 'the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and 'the absence of ready alternatives' available to the prison for achieving the governmental objectives. *Brodheim*, 584 F.3d at 1272 (quoting *Shaw v. Murphy*, 532 U.S. 223 (2001), quoting *Turner*).

6

**2. Count I**

7

8

9

10

11

There is no dispute that the disciplinary action taken against Plaintiff constitutes adverse action in the context of his retaliation claim. Nor is there a dispute that filing grievances constitutes protected conduct. The dispute with respect to Count I, therefore, surrounds the causation, chilling effect, and legitimate penological interest elements of Plaintiff's claim. Those elements will be addressed by the court, in turn.

12

**a. Causation**

13

14

Defendants argue that Plaintiff relies on his mere speculation to support the causation element of his retaliation claim.

15

16

17

18

19

20

21

22

23

Plaintiff has produced evidence that he filed several grievances alleging misconduct on the part of Rimington on February 24, 2011, including allegations of physical assault and sexual misconduct, and then on February 28, 2011, he filled out an emergency grievance form again complaining about Rimington being assigned to his unit. (Doc. # 44 at 3; Doc. # 44 at 58-62; McDowell Decl., Doc. # 44 at 63 ¶ 4.) When he finished filling out the emergency grievance, he called Oxborrow and asked him to send someone to pick up the grievance, and shortly thereafter, Rimington arrived. (Doc. # 44 at 3; McDowell Decl., Doc. # 44 at 63 ¶ 5.) Rimington looked over the grievance and said that Plaintiff would be sorry if he had to give the grievance to Senior Correctional Officer Oxborrow. (*Id.*)

24

25

26

Rimington and Oxborrow both maintain that they did not issue the write up and disciplinary charges because of Plaintiff's grievances; rather, they assert that it was Plaintiff's conduct that resulted in the action taken against him.

27

28

The court finds that the asserted statement made to Plaintiff by Rimington, that

15

Plaintiff would be sorry if he had to give the grievance to Oxborrow, given the proximity of the filing of the grievances and the fact that it was made when he was picking up an emergency grievance that addressed his own conduct,  creates a genuine issue of material fact as to the causation element of Plaintiff's retaliation claim. In addition, the statement in Bryant's disciplinary summary that Oxborrow stated that he heard Plaintiff make the threats against Rimington, when compared to Oxborrow's statement in his declaration and in his responses to discovery that he heard someone yelling but did not actually hear the threats, also indicates the presence of a material factual issue concerning whether Oxborrow and Rimington retaliated against Plaintiff for filing grievances.

Therefore, the court finds that Plaintiff has produced evidence which creates a genuine issue of material fact as to the causation element of the retaliation claim in Count I.

### b. Chilling effect

Defendants argue that Plaintiff cannot demonstrate the adverse action had a chilling effect on his First Amendment activity because he filed numerous grievances during the pendency of the disciplinary matters and thereafter.

Defendants have applied the wrong standard to this element of Plaintiff's claim. The Ninth Circuit has instructed that the inquiry with respect to the chilling effect is an objective one that centers on whether subjecting an person to the disciplinary process for filing grievances would chill a person of ordinary firmness from pursuing First Amendment activities. *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568-69). Here, the court concludes that it would. As Plaintiff put it, if an inmate was subjected to the disciplinary process in response to filing grievances, a reasonable inmate likely conclude that he should stop filing grievances. In *Brodheim*, the defendants also produced evidence of the number of grievances the prisoner had filed after the incident, arguing the inmate could not establish his First Amendment rights were chilled. There, the Ninth Circuit explained that the "focus on whether or not the record showed [the inmate] was actually chilled was incorrect." *Id*. at 1271. The objective standard is applied because "[t]o hold otherwise 'would be unjust' as it would 'allow

1  a defendant to escape liability for a First Amendment violation merely because an unusually

2  determined plaintiff persists in his protected activity." *Id.* (citing *Rhodes*, 408 F.3d at 569).

3        As a result, Defendants have not met their burden of providing evidence to negate this

4  element of Plaintiff's claim or showing that Plaintiff cannot establish this element of his claim.

5                         **c. Legitimate penological interest**

6        Defendants claim that discouraging inmates from being verbally abusive and

7  threatening staff clearly advances a legitimate correctional goal, and charging an inmate with

8  violating these rules if they do so at the risk of a disciplinary sanction is reasonably related to

9  this goal. With respect to Count I, Defendants argue that Plaintiff was accused with threatening

10 to sexually assault and murder Rimington's family members, a disciplinary hearing was held,

11 he was found guilty, and placed in disciplinary segregation. They assert that this was a

12 necessary manner to deal with Plaintiff's conduct and to assure the safety and security of the

13 institution; therefore, their conduct served a legitimate penological purpose.

14       Plaintiff does not address the legitimate penological interest element of his claim in

15 Count I. However, because Plaintiff was not the moving party with respect to Count I, and

16 Defendants were, it was their burden to provide evidence to negate this element of Plaintiff's

17 claim or prove that Plaintiff cannot establish this element. The court finds that Defendants did

18 not meet their burden. Their cursory statement that discouraging inmates from being verbally

19 abusive and threatening staff is a legitimate penological interest does not address the *Turner*

20 factors with respect to their proffered goal of discouraging inmates from verbally abusing and

21 threatening staff.

22       In sum, the court finds that summary judgment should be denied as to Defendants on

23 Count I.

24       **3. Count IV**

25       As with Count I, there is no dispute that subjecting Plaintiff to disciplinary action

26 constitutes adverse action or that filing grievances is protected activity in the context of a

27 retaliation claim. Again, the parties dispute the causation, chilling effect and legitimate

28                                    17

penological purpose elements of Plaintiff's claim. With respect to the chilling effect element, Defendants assert the same argument for Count IV as they did for Count I. For the reasons stated above, the court finds that material factual issues exists as to this element. The court will now address the causation and legitimate penological interest elements of this claim.

### a. Causation

As they argued with respect to Count I, Defendants assert that Plaintiff is merely speculating as to the causal connection between his filing of grievances and the adverse action taken against him in Count IV. They maintain that the only reason disciplinary action was taken against Plaintiff was because he made false statements regarding the Kosher meal incident.

Plaintiff, on the other hand, has proffered evidence relative to the timing of the filing of the grievances and the writing of the notice of charges which serves as circumstantial evidence of retaliatory intent. *See Sorrano's Gasco*, 874 F.2d at 1316. Here, according to Plaintiff, he told Oxborrow he wanted to fill out an emergency grievance about Rimington's conduct concerning the Kosher food incident on November 16, 2011, at 11:13 a.m. (Doc. # 45 at 14.) An hour later Rimington slid an emergency grievance under the door, and Plaintiff filled it out. (*Id*., Doc. # 44 at 48-50.) Plaintiff then told Oxborrow it was ready to be retrieved, and Rimington picked the grievance up from Plaintiff's cell. (Doc. # 45 at 14; Doc. # 44 at 48.) The emergency grievance stated that Rimington slammed his meal so hard that its contents exploded, and asserts that this was a result of Plaintiff's lawsuit against Rimington for sexual misconduct. (Doc. # 44 at 48.) When Plaintiff formally received the notice of charges on December 31, 2011, he asserts that it indicated that it was written up on November 16, 2011, at 3:50 p.m. (*Id*.; *see also* Doc. # 44 at 52 (indicating that the charges were written on November 16, 2011).)

The court finds that Defendants have not negated this element of Plaintiff's claim or established that Plaintiff cannot establish this element of his claim. Plaintiff has produced evidence which raises a genuine issue of material fact as to the causation element because of the proximity in time of the filing of the grievance and the writing of the disciplinary

1  report/notice of charges, and because of the contents of the emergency grievance which

2  Rimington read shortly before the notice of charges was written. However, Defendants' provide

3  sworn statements that the disciplinary action was taken because Plaintiff made a false

4  statement regarding the Kosher meal incident, and not in retaliation for filing grievances.

5  Plaintiff disputes this, asserting these statements are controverted by the fact that the false

6  statement charge against Plaintiff was dismissed, with the hearing officer believing Plaintiff's

7  version of events over Defendants'.

8       A fact-finder believing Defendants' statements over Plaintiff's could reasonably conclude

9  there was no intent to retaliate against Plaintiff. Likewise, a fact-finder believing Plaintiff's

10  version of events, given the temporal proximity of the filing of the grievance and writing of the

11  charges as well as the fact that the charge was ultimately dismissed, could reasonably conclude

12  that Defendants intended to retaliate against Plaintiff. Therefore, the court finds that a genuine

13  issue of material fact exists as to the causation element of Plaintiff's retaliation claim in Count

14  IV.

15              **b. Legitimate penological interest**

16       Defendants assert that they had a legitimate penological interest in discouraging inmates

17  from hindering, interfering and delaying staff and from making false statements to prison staff.

18  They argue that they advanced these goals by holding the disciplinary hearing after issuing the

19  notice of charges and negotiating a plea, verbally reprimanding Plaintiff for hindering,

20  interfering and delaying staff. (Doc. # 41 at 8.) They contend that this was a necessary manner

21  to deal with Plaintiff's misconduct and to assure NDOC runs properly without the interference

22  and hindrance of inmates; therefore, their conduct served a legitimate penological purpose.

23  (*Id.*)

24       Plaintiff disputes this, and contends that there was no legitimate correctional goal in

25  mind in subjecting him to the disciplinary process for filing grievances. (Doc. # 45 at 17-18.)

26  In support of this, Plaintiff points to the fact that he defeated the charge of giving false

27  information, and with respect to Defendants' claim that there was a negotiated plea with

28

1   respect to the hindering and interfering charge, he asserts that this is impermissible under

2   NDOC's own regulations. (*Id.* at 18.)

3       The court finds that Plaintiff has shown that a genuine issue of material fact exists as to

4   whether the action taken against him advanced a legitimate correctional goal, asserted by

5   Defendants as preventing the hinderance, interference and delay of staff and precluding the

6   issuance of false statements to prison staff, because according to Plaintiff, the charge of making

7   a false statement was dismissed, and the hearing officer found in his favor as to the interfering

8   or hindering with staff charge. Again, Defendants only present a conclusory statement

9   regarding their proffered correctional goal, and fail to address the *Turner* factors.

10       In sum, the court finds that summary judgment should not be granted in favor of either

11   party on Count IV.

12   **B. Conspiracy**

13       42 U.S.C. § 1985 proscribes conspiracies to interfere with an individual's rights. The

14   elements of a conspiracy claim are: (1) an agreement or meeting of the minds to violate

15   constitutional rights, and (2) an actual deprivation of those rights resulting from the alleged

16   conspiracy. *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002)*; see also Hart v. Parks*, 450 F.3d

17   1059, 1071 (9th Cir. 2006). "To be liable, each participant in the conspiracy need not know the

18   exact details of the plan, but each participant must at least share the common objective of the

19   conspiracy." *Franklin*, 312 F.3d at 441 (internal quotation marks and citation omitted).

20       Defendants assert that Plaintiff has produced no evidence of a conspiracy between

21   Oxborrow and Rimington to retaliate against Plaintiff.

22       Plaintiff has provided a declaration stating that when Rimington picked up his

23   emergency grievance, he said to Plaintiff that he would be sorry if he had to give the emergency

24   grievance to Oxborrow. In addition, Plaintiff points to Bryant's disciplinary hearing summary

25   which states that he relied in part on Oxborrow's verbal statement that he heard the threats

26   made by Plaintiff against Rimington's family, but then, Oxborrow stated in his discovery

27   responses and in his declaration supporting Defendants' motion that he heard yelling, but did

28

1   not hear the substance of the yelling. The court finds that drawing reasonable inferences in

2   Plaintiff's favor, Plaintiff has raised a genuine issue of material fact as to whether Oxborrow

3   and Rimington conspired to retaliate against Plaintiff. Thus, Defendants should not be granted

4   summary judgment as to the conspiracy claim. Plaintiff has not established that he would be

5   entitled to a directed verdict if this evidence went uncontroverted at trial because material

6   factual issues exist as to the underlying retaliation claim; therefore, summary judgment should

7   not be granted in Plaintiff's favor.

8   **B. DUE PROCESS**

9       **1. Standard**

10      The Fourteenth Amendment provides, "[n]o State shall…deprive any person of life,

11  liberty, or property, without due process of law." U.S. Const.  amend XIV, § 1. To invoke its

12  protections, an inmate "must establish that one of these interests is at stake." *Wilkinson v.*

13  *Austin*, 545 U.S. 209, 221 (2005); *see also Wolff v.  McDonnell*, 418 U.S. 539, 558 (1974);

14  *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). Once a plaintiff has established

15  that one of these interests is at stake, the court's analysis turns to whether the inmate suffered

16  a denial of adequate procedural protections. *See Biggs v.  Terhune*, 334 F.3d 910, 913 (9th Cir.

17  2003) (citations omitted).

18      "A liberty interest may arise from the Constitution itself, by reason of guarantees

19  implicit in the word 'liberty,'…or it may arise from an expectation or interest created by state

20  laws or policies[.]" *Wilkinson*, 545 U.S. at 221 (citations omitted); *see also Chappell*, 706 F.3d

21  at 1062 (citing *Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir. 1992)).

22      First, under the Constitution itself, a liberty interest is implicated when the conditions

23  of confinement "[exceed] the sentence in such an unexpected manner as to give rise to

24  protection by the Due Process Clause of its own force." *Mitchell v.  Dupnik*, 75 F.3d 517, 523

25  (9th Cir.  1996) (internal quotation marks and citation omitted); *see also Chappell*, 706 F.3d

26  at 1062-63 (citations and internal quotation marks omitted) ("As long as the conditions or

27  degree of confinement to which the prisoner is subjected is within the sentence imposed upon

28                                                    21

him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."). The Ninth Circuit has recognized that "only the most extreme changes in the conditions of confinement" such as "involuntary commitment to a mental institution" and "forced administration of psychotropic drugs" have been found to "directly invoke the protections of the Due Process Clause." *Chappell*, 706 F.3d at 1063 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980) and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)). Other circumstances where a liberty interest has been found as arising from the Due Process Clause itself include: revocation of probation, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); revocation of parole status (not just mere denial of parole), *Morrissey v. Brewer*, 408 U.S. 471 (1972); and labeling an inmate as a sex offender**,** *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997). In *Meachum v. Fano*, the Supreme Court held that the Due Process Clause itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement. *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *see also Wilkinson*, 545 U.S. at 221-22.

Second, "[a] state may create a liberty interest through statutes, prison regulations, and policies." *Chappell*, 706 F.3d at 1063 (citing *Wilkinson*, 545 U.S. at 222 and *Neal*, 131 F.3d at 827). *Sandin v. Conner*, 515 U.S. 472 (1995), rejected the previously employed approach for evaluating whether there was a state-created liberty interest by looking at the mandatory language of prison regulations. *Sandin*, 515 U.S. at 481. Instead, *Sandin* directed that it was more important to look at the "nature of the deprivation." *Chappell*, 706 F.3d at 1063 (citing *Sandin*, 515 U.S. at 481).

*Sandin* held that liberty interests created by the state are generally limited to "freedom from restraints which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *accord Wilkinson*, 545 U.S. at 222-23; *Chappell*, 706 F.3d at 1063-64.

22

1    The Supreme Court has thus far declined to establish a "baseline from which to measure

2    what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223

3    (noting inconsistent conclusions among the circuits, but concluding that assignment to Ohio's

4    "Supermax" facility satisfied this standard "under any plausible baseline"). The Ninth Circuit

5    has concluded that in order to determine whether a restraint imposes "atypical and significant

6    hardship," a court should consider a condition or combination of conditions or factors on a case

7    by case basis, rather than invoking a single standard. *See Chappell*, 706 F.3d at 1064 (quoting

8    *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (confirming that the inquiry is "context-

9    dependent" and requires "fact by fact consideration"); *accord Serrano v. Francis*, 345 F.3d

10   1071, 1078 (9th Cir. 2003) (quoting *Keenan*, 83 F.3d at 1089); *Ramirez v. Galaza*, 334 F.3d

11   850, 861 (9th Cir. 2003).

12   At least three factors have been used to guide this inquiry: (1) "whether the conditions

13   of confinement 'mirrored those conditions imposed upon inmates in analogous *discretionary*

14   confinement settings, namely administrative segregation and protective custody;'"; (2) "the

15   duration and intensity of the conditions of confinement;" and (3) "whether the change in

16   confinement would 'inevitably affect the duration of [the prisoner's] sentence.'" *Chappell*, 706

17   F.3d at 1064-65 (italics and alteration in original) (quoting *Pifer v. Marshall*, 139 F.3d 907 (9th

18   Cir. Feb. 24, 1998) (unpublished)); *see also Serrano*, 345 F.3d at 1078 (citing *Sandin*, 515 U.S.

19   at 486-87); *Keenan*, 84 F.3d at 1089. Thus, "*Sandin* requires a factual comparison between

20   conditions in general population or administrative segregation (whichever is applicable) and

21   disciplinary segregation, examining the hardship caused by the prisoner's challenged action in

22   relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353 F.3d 750, 755 (9th

23   Cir. 2003).

24       **2. Analysis**

25           **i. Did Plaintiff have a protected liberty interest in avoiding placement**

26   **in disciplinary segregation under these circumstances?**

27   Here, Defendants do not dispute that Plaintiff served 180 days in disciplinary

28                                                    23

1  segregation as a result of being found guilty of the charge by hearing officer Bryant; however,

2  they do not address whether his placement in disciplinary segregation implicated a protected

3  liberty interest. Instead, they appear to argue that even assuming Plaintiff did have a protected

4  liberty interest, he was afforded all the process he was due.

5        As noted in the background section of this report and recommendation, Plaintiff has

6  provided several descriptions of his conditions of confinement during his 180 days in

7  disciplinary segregation as compared to the conditions in general population. For example, he

8  asserts that he suffered from strained relations with his family; that his telephone

9  communications in disciplinary segregation were limited to once per month while he would

10  have had daily telecommunication privileges in general population; his visitation privileges in

11  disciplinary segregation were limited to family and were no-contact and a close friend was

12  prohibited from visiting him during this time period; in disciplinary segregation he was forced

13  to live in close proximity to prisoners who were psychologically disturbed and who would bang

14  on their bunks, sinks, and toilets all day and night resulting in Plaintiff experiencing sleep

15  deprivation and heart palpitations; in disciplinary segregation he was forced to shower on his

16  knees in water contaminated with the bodily fluids of other inmates while he would not have

17  had to do this in general population; he had no access to coffee, television or music while

18  housed in disciplinary segregation. In addition, he asserts that in the first three weeks in

19  disciplinary segregation, he had only his undergarments, and was not provided with a mattress

20  or bedding; nor was he provided hygiene products or utensils during this period of time.

21        Plaintiff has not asserted extreme conditions which exceed his sentence "in such an

22  unexpected manner as to give rise to protection by the Due Process Clause of its own force." *See*

23  *Mitchell*, 75 F.3d at 523; *see also Chappel*, 706 F.3d at 1063 (noting that only the most extreme

24  circumstances such as involuntary commitment to mental institution, forced administration

25  of psychotropic drugs give rise to a liberty interest from the Due Process Clause itself); *see also*

26  *Meachum*, 427 U.S. at 225 and *Wilkinson*, 545 U.S. at 221 (Fourteenth Amendment does not

27  confer a liberty interest in avoiding more adverse conditions of confinement). Thus, the court

28

must determine whether the conditions Plaintiff endured during his placement in disciplinary segregation rise to the level of an atypical and significant hardship thereby implicating a state created liberty interest. This requires an inquiry into at least each of the factors outlined in *Sandin*.

First, the court must consider the conditions in disciplinary segregation as compared with those in general population or administrative segregation so as to determine whether they comport with the prison's discretionary authority. *Sandin,* 515 U.S. at 486-87.

Plaintiff's assertions that he was limited to family-only, no-contact visits; was forced to shower on his knees, in contaminated water, for 180 days; that he was forced to endure noise created by other prisoners which caused him to seek treatment from NDOC's psychiatric providers; as well as the assertion that he did not have a mattress, pillow, bedding hygiene products, or clothing other than undergarments, for the first three weeks, weighs in favor of finding Plaintiff was faced with conditions constituting an aytpical and significant hardship. *See, e.g., Ramirez*, 334 F.3d at 861 (remanding issue to district court for application of *Sandin* factors where inmate alleged segregated housing unit for two years, and it was overcrowded and violent, the isolation severed ties to his family, and caused him to be made a psychiatric patient). The most troubling of these factors is the fact that Plaintiff was forced to shower on his knees in contaminated water for 180 days, and that for three weeks he did not have any bedding or a mattress or clothes other than his undergarments. Believing these facts, and drawing all reasonable inferences in Plaintiff's favor, the court finds this weighs in favor of finding Plaintiff was faced with an atypical and significant hardship.

Second, the court considers the duration of the condition and degree of restraint imposed. *Sandin, 515 U.S. at 486-87.*

There is no bright-line rule as to whether a certain number of days in disciplinary segregation constitutes an atypical and significant hardship; however, the Ninth Circuit has noted that the amount of time spent in segregation should be considered. *See Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (quoting *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978)). In

25

*Sandin*, the court found that thirty days in disciplinary segregation, when the conditions mirrored those in administrative segregation, did not constitute an atypical and significant hardship. In *Ramirez*, the court remanded the issue to the district court to consider the *Sandin* factors as well as the fact that the inmate had been confined to segregation for two years. *Ramirez*, 334 F.3d at 864. Other courts have come to varying conclusions regarding the duration of confinement in segregation, including conclusions that stays in segregation much longer than Plaintiff's do not rise to the level of atypical and significant hardship. *See, e.g.*, *Smith v. Mensinger*, 293 F.3d 641 (3d. Cir. 2002) (seven months disciplinary confinement insufficient); *Merchant v. Hawk-Sawyer*, 37 Fed. Appx. 143 (6th Cir. 2002) (21-month confinement insufficient); *Freeman v. Department of Corrections*, 447 Fed. Appx. 385 (3d Cir. 2011) (disciplinary sentence of 360 days not sufficient to implicate liberty interest).

Here, Plaintiff spent 180 days in disciplinary segregation. Again, this is more than the thirty-days in *Sandin*, but less than some of the time spent in segregation described above. The court cannot conclude that the amount of time Plaintiff spent in disciplinary segregation, in and of itself, created an atypical and significant hardship. Rather, the court will look at this factor in conjunction with the other factors.

Finally, the court considers whether the state's action will invariably affect the duration of Plaintiff's sentence. *Sandin, 515 U.S. at 486-87*. Plaintiff does not address this factor so the court cannot make a conclusion as to whether it weighs in Plaintiff's favor.

Regardless of the outcome of the court's analysis of whether Plaintiff has presented facts establishing that he was faced with an atypical and significant hardship, even assuming this was the case so that Plaintiff had a protected liberty interest, the court finds that Plaintiff's due process rights were not violated.

### ii. Procedural protections

Assuming that a liberty interest is implicated by Plaintiff's placement in disciplinary segregation for 180 days under the conditions described above, the court will now turn to an analysis of what procedural protections Plaintiff was due and whether he was afforded those

1    protections.

2         The Supreme Court has held that in the context of prison disciplinary proceedings

3    inmates must be afforded certain procedural protections. "[T]he fact that prisoners retain

4    rights under the Due Process Clause in no way implies that these rights are not subject to

5    restrictions imposed by the nature of the regime to which they have been lawfully committed."

6    *Wolff*, 418 U.S. at 556 (citations omitted). "Prison disciplinary proceedings are not part of a

7    criminal prosecution, and the full panoply of rights due a defendant in such proceedings does

8    not apply." *Id.* (citation omitted).  In other words, while "a prisoner is not wholly stripped of

9    constitutional protections when he is imprisoned for crime," *id.* at 555, his interest in due

10   process "must be accommodated in the distinctive setting of a prison" in order to "[assure] the

11   safety of inmates and prisoners, [avoid] burdensome administrative requirements that might

12   be susceptible to manipulation, and [preserve] the disciplinary process as a means of

13   rehabilitation." *Superintendent, Massachusetts Correctional Institution, Wapole v. Hill*, 472

14   U.S. 445, 454-55 (1984) (citations omitted).

15        When an inmate faces disciplinary charges, due process requires that the inmate receive:

16   (1) written notice of charges; (2) at least twenty-four (24) hours between the time the prisoner

17   receives the written notice and the time of the hearing, so that the prisoner may prepare his

18   defense; (3) a written statement by the hearing officer of the evidence relied upon and the

19   reasons for taking disciplinary action; (4) the right of the prisoner to call witnesses in his

20   defense, when permitting him to do so would not be unduly hazardous to institutional safety

21   or correctional goals; and (5) legal assistance if the prisoner is illiterate or the issues presented

22   are legally complex. *Wolff*, 418 U.S. at 556.

23                              **a. Witnesses and witness statements**

24        Plaintiff claims that his due process rights were denied when his request to present

25   witnesses and witness statements was refused by the hearing officer. Defendant Bryant

26   counters he was within his discretion to deny Plaintiff's request to present witnesses and their

27   statements because he conceded that these witnesses would corroborate Plaintiff's version of

28                                            27

events, and therefore, these witnesses and their statement would have been redundant.

While the Supreme Court has held that an "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense[,]" this is a qualified right. *See Wolff*, 418 U.S. at 566; accord, *Baxter v. Palmigiano*, 425 U.S. 308, 320 (1976); *see also Bostic v. Carlson*, 884 F.2d 1267 (9th Cir. 1989) (finding that inmate's due process rights were not violated when prison officials refused to allow him to call certain witnesses after finding their testimony would have been repetitive and not added anything to the hearing; "interest in calling more witnesses was outweighed by the institution's interest in maintaining order and discipline, where the witnesses would not provide any pertinent new information"). An inmate is "permitt[ed][ ] to do so [when it would] not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566.

"Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Id*. Thus, there must be a balancing of the inmate's interest and the needs of the prison such that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id*. The Supreme Court recognized that "[t]he operation of a correctional institution is at best an extraordinary difficult undertaking" and prison officials "must have the necessary discretion [with respect to limiting an inmate's right to call witnesses] without being subject to unduly crippling constitutional impediments." *Id*. at 566-67. A blanket policy of prohibiting inmates from calling witnesses is not permitted. *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir. 1995).

Defendant Bryant maintains that he considered Plaintiff's request to call certain witnesses and present their statements, conceded that these witnesses would concur with Plaintiff's version of events, and therefore, concluded that presentation of the witnesses and

1    their statements would be redundant and unnecessary. (Bryant Decl. ¶ 6.) This is corroborated

2    by Bryant's summary report of the disciplinary hearing. (Doc. # 23 at 23.)

3         Under the Supreme Court's direction in *Wolff* that prison officials must be granted

4    discretion to limit an inmate from calling witnesses, which the Ninth Circuit has interpreted

5    as including the exclusion of witnesses and presumably witness statements when they would

6    not add any new information to the hearing, the court must conclude that Plaintiff's due

7    process rights were not violated when defendant Bryant denied Plaintiff's request to present

8    witnesses and their statements. It should be noted that Plaintiff has not alleged or offered

9    evidence that there is a blanket policy of denying requests to present witnesses at disciplinary

10   hearings, which would not be permitted. *See Mitchell*, 75 F.3d at 525.

11                          **b. Evidence supporting decision**

12        Plaintiff also argues that the hearing officer's determination was "arbitrary and

13   capricious." (Doc. # 23 at 10.)

14        While Defendants assert that the only claim stated in the Complaint for due process is

15   based on the alleged refusal to call witnesses or to consider the witness statements, they

16   address in some detail the merits of Plaintiff's apparent claim that the determination was not

17   supported by "some evidence."

18        The court agrees that the screening order did not identify a colorable claim based on an

19   alleged deficiency in the evidence relied on in making the disciplinary determination; however,

20   the court nonetheless concludes that this standard has been satisfied, and to the extent

21   Plaintiff's Complaint can be interpreted to assert such a claim, it should be foreclosed.

22        "[T]he requirements of due process are satisfied if some evidence supports the decision

23   by the prison disciplinary board..." *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445,

24   455 (1985); *see also Wapole v. Hill*, 472 U.S. 445, 454-55 (1984) (citations omitted)*; Bruce v.*

25   *Ylst*, 351 F.3d 1283, 1287-88 (9th Cir. 2003).

26        In *Hill*, the Supreme Court stated, "[a]scertaining whether this standard is satisfied does

27   not require examination of the entire record, independent assessment of the credibility of

28                                        29

witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board." *Id.* at 455-56 (citations omitted) (emphasis added). The Court declined to adopted a more stringent standard, reasoning, "[p]rison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances." *Id.* at 456 (citation omitted). The Court recognized, "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Id.* The court is "not to make its own assessment of the credibility of witnesses or reweigh the evidence." *Cato*, 824 F.2d at 705 (citing *Hill*, 472 U.S. at 455).

Defendants have submitted evidence that hearing officer Bryant relied on Plaintiff's statement as well as the statement of Rimington and the verbal statement of Oxborrow in coming to his conclusion regarding Plaintiff's guilt. (Bryant Decl. ¶ 7; *see also* Doc. # 23 at 24.) It is not the province of this court to reweigh the evidence or to assess the credibility of the witnesses, as Plaintiff suggests. That being said, even if Oxborrow's verbal statement were completely discredited, Bryant still indicates reliance on the report of Rimington, which stated that Plaintiff made egregious threats against him and his family members, and would constitute "some evidence" in support of the disciplinary finding of guilt. Therefore, the court finds that the disciplinary finding was supported by "some evidence," and Plaintiff's claim that his due process rights were violated in this regard cannot be sustained.

### c. Impartiality of hearing officer

Plaintiff also argues in his brief that his due process rights were violated because Bryant was both the investigating officer and sole officer presiding over his disciplinary hearing. (Doc. # 23 at 7-8, 11; Doc. # .)

Defendants are correct that the court did not construe Plaintiff's Complaint as asserting a due process claim related to the alleged impartiality of the hearing officer. Nor does the court believe that a fair reading of Plaintiff's Complaint could result in this interpretation. The court's

1   screening order states that Plaintiff could proceed with a claim for due process related to his

2   allegations that Bryant refused his request to present witnesses and their statements at his

3   hearing. (Doc. # 3 at 5-6.) The screening order makes no mention of allowing Plaintiff to

4   proceed with a due process claim related to the alleged impartiality of Bryant.

5          Even assuming Plaintiff had stated a claim regarding Bryant's alleged impartiality, the

6   court finds that Bryant would be entitled to summary judgment on this claim.

7          This district has held that the Due Process Clause guarantees inmates a right to fair and

8   impartial disciplinary hearings. *See Willoughby v. Luster*, 717 F.Supp. 1439, 1441 (D. Nev.

9   1989) (citing *Wolff*, 418 U.S. at 571); *see also Merritt v. De Los Santos*, 721 F.2d 598, 601 (7th

10   Cir. 1983); *McCann v. Coughlin*, 698 F.2d 112, 122 (2d Cir. 1983)). This right does not require

11   that the disciplinary committee come from outside the prison, because "[i]n general, prison

12   officials and administrators are quite capable of conducting impartial hearings[.]" *Willoughby*,

13   717 F.Supp. at 1441 (citing *Ruley v. Nevada Bd. of Comm'rs*, 628 F.Supp. 108, 112-13 (D. Nev.

14   1986)). On the other hand, "a prison official who witnesses or investigates an incident cannot

15   sit on a disciplinary committee that determines whether a particular inmate was guilty of any

16   wrongdoing in that incident." *Id.* (citations omitted).

17          Plaintiff points to his Exhibit 1 to support his assertion that Bryant participated in the

18   investigation of the underlying incident. (*See* Doc. # 23 at 11.) Exhibit 1 is the notice of charges

19   and summary of hearing officer's inquiry and disposition. (Doc. # 23 at 21-26.) However, it is

20   not evident from these documents that Bryant participated in the investigation of the incident.

21          According to defendant Bryant, he was assigned as the disciplinary hearing officer for

22   this charge in April 2011. (Bryant Decl. ¶ 4.) He states that "*in preparation of the disciplinary*

23   *hearing*, [he] spoke to Senior Officer Oxborrow prior to the hearing…" He does not state that

24   this was in connection with an investigation of an incident. Moreover, he asserts that he was

25   appointed as the hearing officer in April 2011, and this incident took place at the end of

26   February 2011. The inference cannot reasonably be drawn that Bryant's discussion with

27   Oxborrow "in preparation of the hearing" was part of the investigation of the underlying

28                                                          31

incident.

Additionally, Plaintiff has produced Bryant's discovery responses in connection with his response to Defendants' cross-motion wherein Bryant states that he was *not* the investigating officer, but that it was common for hearing officers to interview persons involved in the incident. (Doc. # 44 at 30 (Interrogatory No. 11 and response); Doc. # 44 at 32-33 (Interrogatory No. 25 and response).) While Plaintiff disputes that this is the case, he has not presented evidence to support his position.

Thus, to the extent Plaintiff's Complaint could possibly be construed as asserting a due process claim based on the impartiality of  hearing officer, summary judgment should be granted in Bryant's favor.

**C. Official capacity damages claims**

A state official sued in his or her official capacity for *damages* is not  a person subject to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Claims against defendants in their official capacities are actually suits against the entity of which the named defendants are agents. *See Kentucky v. Graham*, 473 U.S. 159 (1985). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. at 166. The real party in interest in such suits is the entity itself, and the entity, not the named defendant, will be liable for any damages. *Id*. Defendants' motion for summary judgment on Plaintiff's official capacity damages claims should be granted.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **DENYING** Plaintiff's partial motion for summary judgment (Doc. # 23) **AND GRANTING IN PART AND DENYING IN PART** Defendants' cross-motion for summary judgment (Doc. # 41) as follows:

(1) Plaintiff's partial motion for summary judgment (Doc. # 23) as to Counts III and IV should be **DENIED**;

(2) Defendants' cross-motion for summary judgment (Doc. # 41) should be denied as to Counts I, II, and IV, which are asserted against defendants Rimington and Oxborrow;

(3) Defendants' cross-motion for summary judgment (Doc. # 41) should be granted as to Count III, which is asserted only against defendant Bryant;

(4) Defendants' cross-motion for summary judgment (Doc. # 41) as to Plaintiff's official capacity damages claims should be **GRANTED**.

The parties should be aware of the following:

1.    That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED:  June 24, 2013.

_____
WILLIAM G.  COBB
UNITED STATES MAGISTRATE JUDGE

33